May it please the Court, and good morning. This Court, just over a decade ago, said that the Forest Service can regulate national forest lands by holders of unpatented mining claims, but only to the extent that those regulations are reasonable and don't impermissibly encroach on legitimate uses incident to mining. The Forest Service's failure to act for 13 years amounted to an unreasonable limitation on Mr. Tracy's legitimate right to mine on forest lands. But what gave Mr. Tracy the right at that point to say, well, I'm my own law. I'm not going to maintain my permit application. I'm just going to do what I want to do. Well, I think Mr. Tracy certainly could have done things better, but his actions he didn't do that until July of 2009, had already been 13 years. And that doesn't excuse the Forest Service's failure to do anything from 2009. Well, there's a legal remedy, right, when an agency fails to act? There was an administrative remedy. There's also a judicial remedy. Yes. And he could have pursued that. He didn't pursue that. He pursued self-help, in effect. He did, and, you know, the government relied on the United States v. Lowery to say that he can't collaterally attack the Forest Service's failure to act. He can't just act on his own. There's two ways that I would distinguish this case from Lowery. The first is, Ms. Lowery didn't raise due process violations, and Lowery, the Court first determined that she did not have individual aboriginal title. That's different than this case, where Mr. Tracy had important property rights at issue. He had a valid, unpatented mining claim that wasn't at issue in this case, and where property rights are at issue, due process requires further action. But having those property rights, however we characterize them, doesn't give him the right to go forward in any fashion he chooses, particularly in a fashion that does have an impact on the environment, on resources of surrounding property. I understand his concern, but somehow I find it difficult to understand how frustration amounts to a get-out-of-jail-free card. Well, I think, you know, keep in mind, if the Forest Service doesn't act on a plan of operations, if they refuse to do anything, then the regulations don't have any meaning requiring him to go and get a plan of operations. Well, then, you can go to court, you can seek mandamus, there is relief available, you've acknowledged that, I mean, you're a lawyer, you know that. Yes. And I think, isn't it the case our system says, okay, you're grieved, take your grievance up in the appropriate fashion, not do whatever you want to do after that and hope that the consequences don't turn out to be too bad. In the context of the criminal case, the government, of course, bears the burden to prove each element beyond a reasonable doubt. They have to prove that he had, that he was required to have a plan of operations. And we're saying in the criminal context they didn't prove that he had to have one because when he tried to get one, and he filed two, one in 1996, one in 2005, when he tried to get one, they just drug their feet. And when Mr. Johnson testified, he couldn't provide any explanation for their failure to act between 1996 and 2004 when there was a meeting held. He couldn't provide any explanation for what happened. Well, I understand that, and that's probably what explains the sentence that he was given. I mean, it's apparent that the district court judge understood what was going on, too, and yet you've still got the problem that he had legal alternatives at that point in time. Instead, he chose to go forward, did, in fact, knowingly use the national forest by excavating. That resulted in the misdemeanor conviction. It also resulted in a sentence of probation. So it's not like the court's trying to kick him around but is delivering the message there's a better way to go about doing this, and that's how you should do it if you'd be in this situation in the future. I'm not sure what more than that should be done. Well, the Forest Service could have come to him and said they were going to work with him on a plan of operations, given him notice. But one of the main problems was that he needed an environmental impact statement, given the nature of what he wanted to do. Well, I'm glad you raised that issue because, I mean, there certainly was evidence that there was an environmental impact statement required, but no one even decided that until the spring, about March of 2006, the testimony was, 10 years after his first plan of operations. And then it took until, let's see, I have a timeline here. It took until July of 2008 to even have a draft environmental impact statement. There was no explanation provided for that delay. And then there was another seven months before that draft environmental impact statement was published in early 2009. No explanation was provided for that delay. And then by July, when Mr. Tracy finally wrote the Forest Service out of frustration, they still hadn't done anything with it. So granted that they may have needed to do an environmental impact statement, and this case is not about Mr. Tracy saying that they can't regulate mining on Forest Service land. It's not about him saying that there doesn't need to be a balance between environmental interests and legitimate mining interests, but the Forest Service has to do something. And they can't just say we need an environmental impact statement. There's no timeline. We'll let you know and let years go by without doing anything. Do you know, did the government just quickly file a criminal indictment against him or bring charges against him? I'm talking about the prosecutors. The way I recall the evidence is that the officer went out to cite him for mining in early September of 2009, then spoke with his supervisor and they decided to arrest him. And the prosecutor immediately brought charges against him. He was actually held in jail for a couple of weeks when he first was arrested, eventually was released, eventually agreed to have a lawyer represent him, and we went forward. There was no negotiation that I'm aware of about, you know, we're going to bring these charges unless you do something. I gather the problem was that he had diverted some water from one of the streams that he was working in? He did. That's the way that you conduct this form of mining is you divert water and I'm not good at explaining this, but you place the device in that in that diverted water area and go through the minerals looking for gold. After the Forest Service started the process of preparing this environmental impact statement and so forth, although I agree, you know, I don't know what the reason was. There was an interminable delay, but still they finally take it started. At some point shortly after that, Mr. Tracy withdrew his application, right? He did in July 2009. Is there any reason for that? And so he said, so it appears he decided, well, I'm going to go ahead. I'm going to forget about this bureaucratic, you know, paperwork process. I'm just going to go start mining, right? Is that in essence what he decided? Yes. But I think at that point he didn't feel like he had any options because the Forest Service certainly wasn't going to do anything about his efforts. Well, they had finally started moving, though. You know, they had started. They prepared the draft report, right? I would characterize that as a baby step. You know, they finally did something and then they sat on it for months. And then so I mean, they can't really rest on the very tiny step they made of finally preparing a draft environmental impact statement after all those years. You didn't have a – on the criminal case, you didn't have a jury trial, did you? He was not entitled to a jury trial. He would have opted for a jury trial had he been entitled to one. It might have – you know, I mean, I could see where a jury would be sympathetic to his predicament. But it being a low-grade offense, he wasn't entitled to a jury trial, right? Right. As a petty offense, he was not – because he was not facing more than six months, he was not entitled to a jury trial. And I think that Judge Panner was sympathetic to him, too. Well, he was sympathetic to the extent that – and it's not your fault. I don't understand this, but he appointed you in the civil case, right? Yes. Well, what's the authority for that? I don't have the statute right here in front of me. But does the statute say you can – you know, district judge can appoint a public defender in a civil case? Yes, and I don't have the cite here, but I cited the statute to Judge Panner when I actually asked him. I looked at it, but it says nothing about it. Pardon me? The statute says nothing about appointing a lawyer in a civil case. I wish I had the statute in front of me. I cited the statute to Judge Panner and asked him to appoint me on the civil case because they were so related. And, in fact, the motions for summary judgment were heard on the same day as the court trial on the criminal case. And I think it makes – yeah, I think it makes a lot of sense, and I would like the opportunity to provide you with the statute. No, I'm not going to pursue that. I'm just curious about it. I mean, just – I can see it makes sense from the viewpoint of, let's say, efficiency, but I don't know whether the statutory authority of Congress meant for, you know, public money to be spent in this kind of an administrative proceeding. Well, I will say that the criminal case and the civil case are, as you've already noted, very tightly – we put them together, so it's hard to say that they're different. Right. My only comment about the prosecution – you know, about bringing criminal charges was it seems like under all the circumstances, this might have been a case where they might have exercised prosecutorial discretion and simply pursued the civil. You would think so. Mr. Tracy was 38 years old at the time. He had no criminal record and, you know, no other evidence of antisocial behavior, and he was trying to comply the best that he could, given his level of sophistication with Forest Service regulations. He didn't just go out there and say, you know, I don't have to follow these regulations, as some miners have, that I have an absolute right to do this. He tried to comply with those regulations. He believes, as far as you can tell, he believes this is a viable mining claim? Yes, and yes. There are producible minerals, recoverable minerals there? Yes, and the evidence in the criminal trial, as I recall, was that he makes his living doing this, and it's not a part of the record, but he is mining on BLM land at this point, so it is something he does for a living, and it was a viable claim. The one thing we haven't talked about is in the civil case, we also filed a motion to dismiss saying that trespass was the wrong claim to bring in this case, and I believe that it is because he was the possessor of this land, even though the United States held title, he had a valid, unpatented mining claim, and they should not have been able to eject him from the property. And in the United States v. Shumway, the civil case, talked about that a little bit, and the court said that ejectment was the wrong remedy where there was an unpatented mining claim. So we feel like Judge Penna... But the injunction just barred him from conducting mining operations. The injunction was very limited. What Judge Penna ordered was less than what the government requested, but the suit was for trespass, and this wasn't a trespass because he was on the – he was the lawful possessor of this mining claim. But the injunction was to stop mining, wasn't it? The injunction said that he could not mine on that claim. After our objections, the injunction eventually said he couldn't mine on that claim without a plan of operations. And, you know, and... But his possessory interest as the holder of a mining claim is at best conditional, isn't it? In other words, say you have a mining claim over this courthouse, you can't tear down this building and start digging, right? That's right, but... You can do certain things, but... Well, it's one thing to say that the Forest Service could regulate his activities, and we're agreeing with that. They could regulate his activities. But it's another thing to say that he's trespassing on his mining claim. Well, no, but by the time this trespass session was started, he had abandoned his, you know, his permit application, right? So he wasn't even trying to pursue that. He had abandoned... He doesn't have a bare possessory interest. I mean, he has, you know, a possessory interest that's necessarily tied to, you know, his mining rights. Well... And he's kind of abandoned them. In other words, the Forest Service is entitled to, you know, promulgate regulations that, well, if you want to pursue a mining claim on public land, you've got to follow certain procedures, right? No, I don't...    He's not a mere trespasser. So the fact that when this session was started, he had abandoned that, in effect, because he gave up his permit application. I'm through with that. He gave up his plan of operations. He did not give up his mining claim. He had a vested, unpatented mining claim that exists to this day, existed at the time. He never abandoned his mining claim. He still has it. And so I think there's a difference there. He didn't give up. He didn't give up on this claim. In fact, to the contrary, he went out and tried to mine it, and he was stopped. You indicate that you think trespass is the wrong doctrine or theory, but does it really make any difference since the Court did not enter an order of ejectment, did not award damages for trespass, entered an injunction that's really based on what he was doing or trying to do? So what does it matter today what theory was filed in the complaint, given the nature of the injunction that's been entered? Well, I think they need to have a valid claim to sue him, one. And two, he has suffered because he's been deemed a trespasser on his own claim, and he bears the stigma of that, and, you know, he's very upset about it. And that's why we're pursuing this appeal, because he has a ruling in federal court saying that he was trespassing on his own claim, and we think that's wrong. Okay. I'll give you some time for a vote. Let's hear from the government. May it please the Court. Kelly Zusman appearing on behalf of the United States. Your Honor, we're here today because the letters didn't work. The three Forest Service employees that went out to Mr. Tracy's mining site that attempted to convince him to stop and comply with the regulations didn't work. What Mr. Tracy told them was, I want to see a court order. And so that's what he got. And I think Judge Panner very carefully considered all of the equities in this case when he found, in fact, that Mr. Tracy had violated the regulation and that taking the law into his own hands was simply not a viable option, that he had administrative remedies, he had remedies under the APA. There were a whole host of things that he could have done if he was dissatisfied with how the Forest Service was handling his application, but he didn't do them. And what he did was incredibly destructive to the forest. Now, there's no question that from 2005 until 2009 when Mr. Tracy withdrew his application, there were a number of things going on. There was the preparation of an environmental assessment pursuant to NEPA. But the story doesn't really start in 2005, does it? It starts in ñ well, it probably starts when he got his unpatented mining claim. He did submit a plan of operations in 1996. And really, the record does not reveal what happened between 1996 and 2005. What we do know, though ñ So nothing happened, no? I simply can't answer that. I don't know. What we do know, though ñ Did you ask the Forest Service what they did during that long period of time? That question didn't come up, and it wasn't developed in this record in part because it was our position and one that Judge Panner accepted that delay was irrelevant to this particular context. If I were you, I probably wouldn't ask either. That being said, what Judge Panner said about the delay, which I think is important, is this. And it's at the criminal excerpt of Record 68. I recognize his argument that there was too much time taken, too much delay. That's not the issue that I feel controls this case. This case simply turns on the fact that the defendant illegally mined without a plan of operations. So from 1996, he files his first plan. We do know that in 2005, the plan that he filed was a replacement. So that 96 plan is no longer operative. We also know that the focus of the trial before Judge Panner was on that final four years. In Mr. Tracy's motion for a judgment of acquittal, and this is at the criminal SCR at 5, he focuses on that 05 to 09 time period, and he says that was the delay that was unreasonable. In the civil case, in his concise statement of facts, he references the 96 application, but it's not until he references the 2005 that he says the delay was unreasonable, and that's precisely why Judge Panner focused on that time period. Now, there's no question that this took some time. Compliance with the environmental regulations that applied here, it was a time-consuming process. Part of it is explained, if you look at Kevin Johnson's declaration, that the state of Oregon had some significant concerns about Mr. Tracy's plan of operations, and it related to his proposal that he wanted to cut trees right along the stream bed, and the state of Oregon was concerned that that was going to raise the water temperature and threaten endangered coho salmon. So although Mr. Tracy certainly wanted to go out and he wanted to mine for gold, the reality is that his proposed plan of operations threatened all sorts of harm, and that's why that environmental assessment then, because what happens with the environmental assessment under NEPA is that there's either a finding of no significant impact, and then you're essentially done with the NEPA process, or there is a finding that it will have a significant impact, which is what happened here, and it then turns into the more formal environmental impact statement process. That was the process that was ongoing, in addition to the consultation with the state of Oregon about the water quality issues, when Mr. Tracy said, I've had enough, and he withdrew his application. At that point, he received a letter from the district ranger saying, we've received this withdrawal, if you really mean it, that means you can't go out there and mine, and then Mr. Tracy proceeded to do just that. The district ranger warned him, you're going to be in violation of regulations, we're going to take actions to stop you if you do this, and Mr. Tracy went ahead. He took a bulldozer and a backhoe and trucks out there, he cut 20 trees, he caused a significant amount of damage, and ultimately it was the Forest Service that ended up paying that bill, because Judge Panner declined to award remediation costs. So to the extent there's equitable concerns about the Forest Service's delay here, the Forest Service has had to pay for that. What's your response to the Mr. Butler's argument that, well, trespass is the wrong form of action to pursue in facilities? Two responses. One is that I think Judge Panner properly looked at the third prong of the trespass theory, and that is that Mr. Tracy failed to remove from the land a thing which he was under a duty to remove, and that was all of the heavy equipment that he had out there, that the Forest Service told him, get it off here, and he refused to do so without a court order. The second is that this Court has applied trespass in very similar contexts involving mining claimants who act beyond the scope of what they're permitted to do. That was this Court's decision in Nogoria, Goldfield Mines, and it was the theory advanced in Shumway. So I think trespass is a viable theory. And in addition, we needed trespass in order to get the injunction. The regulations alone don't provide for any form of relief, so trespass was our theory in order to convince Judge Panner to immediately enter an injunction because that's what we needed to get the damage stopped. Unless there are further questions from the Court, I would submit. Thank you. Thank you. Just briefly, I now realize I forgot to introduce myself. Brian Butler from the Federal Public Defender's Office. Yes. I just want to respond briefly, and thank you for the opportunity. Mr. Kevin Johnson from the Forest Service did testify about Mr. Tracy's plan of operations in 1996. On cross-examination, I asked him about it. He acknowledged that he knew about the plan of operations in 1996, and I asked him specifically what, if anything, was done in that plan of operations between 1996 and 2005. And I'm at ER 38 and 39. He said, I don't know. So I think we can infer that nothing was done since I was the government's lead witness from the Forest Service. And I just wanted to respond also. You know, the government's argument on trespass is, well, we really needed it, and Judge Panner focused on this third prong, but the cases are clear that the land must be in possession of another. And the Noguera case, the Goldfield Mines case, neither involved somebody who had a valid, unpatented mining claim. So you can't use those cases to argue that trespass is the right cause of action. There isn't a case where someone that I'm aware of where someone had a valid, unpatented mining claim and trespass was the right cause of action. The Shumways had a valid, unpatented mining claim. This court reversed the district court's grant of summary judgment and said there was a valid issue of fact about that. And so, I mean, it didn't specifically address the issue of whether trespass was the right claim or not. They did say ejectment is the wrong remedy here where they have a valid, unpatented mining claim. So I don't think the government can rely on cases where there wasn't a valid claim when that's the core of Mr. Tracy's argument, is that he had this claim and so he can't be. So suppose you had somebody that had that kind of claim exactly like Mr. Tracy had. At the very outset after establishing his claim without bothering to file any application or operations plan, he conducted the operation that your client did many years down the road, had the heavy equipment started excavating and so forth. Plainly, the government would be entitled to do something to stop that. What theory do you think they should have pursued? You know, respectfully, I don't know that I – Mr. Tracy ought to have to come up with that. But it suggests that if the government plainly should have an ability to go forward, we look for what's the right theory. And I'm not sure that trespass is the wrong answer in that context. Well, they can enforce the regulations. They can – in this case, they did enforce those regulations. He wasn't – the criminal charge wasn't for trespass. I mean, I wish they hadn't pursued criminal sanctions, but they certainly have the right to enforce those regulations without saying that he's a trespasser. And they should have an ability to get injunctive relief to stop any further damage from being done. One of the observations made by the government is that the reason they proceeded with trespass is it provides for injunctive relief. The regulations themselves do not. That seems logical to me. Is there a reason why they shouldn't be able to do that or why they should be forced to find some other theory? Well, I mean, the injunction that the government got in this case essentially put them back in square one. It was saying, Mr. Tracy, you have to – you have to get a plan of operations. That's exactly the place he was in before they filed the suit. But except that the heavy equipment wasn't digging anymore and the trees weren't being knocked down anymore, and that's what the government was seeking. And frankly, it's something they should have been entitled to get. So – Well, it may be that there need to be other regulations so that they can, you know, properly enforce those things. Okay. Thank you. Thank you.
judges: Tashima, Paez, Clifton